UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LENORRIS SANDERS

                              Plaintiff,              10-CV-6317T

                   v.                                 **DECISION**
                                                      **and ORDER**
MICHAEL ASTRUE,
Commissioner of Social Security

                              Defendant.
_____

## INTRODUCTION

      Plaintiff, Lenorris Sanders("Plaintiff"), brings this action
pursuant to Title XVI of the Social Security Act, seeking review of
the final decision of the Commissioner of Social Security
("Commissioner"), denying his application for Supplemental Security
Income("SSI").   Specifically, the Plaintiff alleges that the
decision of the Administrative Law Judge, John P. Costello ("ALJ"),
denying Plaintiff's application for benefits, was not supported by
substantial evidence in the record and was contrary to the
applicable legal standards.

      The Commissioner moves for judgment on the pleadings pursuant
to Fed. R. Civ. P. 12 (c) ("Rule 12 (c)"), on the grounds that the
decision of the ALJ was supported by substantial evidence in the
record and was in accordance with the applicable legal standards.
The Plaintiff opposes the Commissioner's motion, and cross-moves
for judgement on the pleadings on the grounds that the ALJ's
decision was not supported by substantial evidence and was contrary
to the applicable legal standards.  This Court finds that the ALJ's

decision was supported by substantial evidence in the record and was in accordance with the applicable legal standards. Therefore, for the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted, and the Plaintiff's motion is denied. Plaintiff's complaint is dismissed with prejudice.

## BACKGROUND

Plaintiff filed an application for Supplemental Security Income on October 30, 2007 under Title XVI of the Social Security Act, claiming disability due to "chronic lower back pain, left leg, [and a] bulging disc." Transcript of the Administrative Proceedings at 42, 99-102 (hereinafter "Tr."). Plaintiff's application was initially denied on February 20, 2008. Id. at 43-46. Plaintiff filed a timely written request for a de novo hearing, which was held on September 20, 2009 before ALJ John P. Costello. Id. at 19-41, 47. Plaintiff appeared at the hearing, without counsel, and testified. Id. at 21-22.

In a decision dated November 3, 2009, the ALJ found that the Plaintiff was not disabled within the meaning of the Social Security Act. Id. at 117-18. Plaintiff sought review by the Appeals Council on January 6, 2010. Id. at 4-5. The ALJ's decision became the final decision of the Commissioner on April 16, 2010, when the Appeals Council denied review. Id. at 1-3. Plaintiff then filed this action.

## DISCUSSION

### I.   Jurisdiction and Scope of Review

42 U.S.C. §405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits.  When considering these cases, this section directs the Court to accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938).  The Court's scope of review is limited to whether or not the Commissioner's findings were supported by substantial evidence in the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim.  See Monger v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding a reviewing Court does not try a benefits case de novo).  The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F.Supp. 265, 267 (S.D. Tex. 1983) (citation omitted).

The Commissioner asserts that the ALJ's decision is supported by substantial evidence in the record and is in accordance with the applicable legal standards, and moves for judgment on the pleadings pursuant to Rule 12 (c).  Under Rule 12 (c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering

the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that Plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. <u>See generally</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). After reviewing the entire record, this Court finds that the Commissioner's decision is supported by substantial evidence in the record, and is in accordance with the applicable legal standards. Therefore, the Commissioner's motion for judgment on the pleadings is granted, and the Plaintiff's motion is denied.

## II. **The Commissioner's decision to deny the Plaintiff benefits was supported by substantial evidence in the record.**

The ALJ found that the Plaintiff was not disabled within the meaning of the Social Security Act. Tr. at 17-18. In his decision, the ALJ adhered to the required 5-step sequential analysis for evaluating Social Security disability benefits cases. <u>Id.</u> at 9-18. The 5-step analysis requires the ALJ to consider the following:

    (1) Whether the claimant is currently engaged in substantial gainful activity;

    (2) if not, whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities;

    (3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;

    (4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;

> (5)   if the claimant's impairments prevent her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

In this case, the ALJ found that: (1) the Plaintiff has not engaged in substantial gainful activity since October 30, 2007; (2) the Plaintiff has the following severe impairments: low back and neck pain; (3) the Plaintiff's impairments do not meet or medically equal the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) the Plaintiff has no past relevant work, but can complete light or sedentary work which requires lifting 20 pounds occasionally and/or 10 pounds frequently, sitting, standing and/or walking for about 6 hours in an 8-hour workday, pushing and/or pulling machinery controls, and does not include overhead lifting, and (5) there are a significant number of jobs in the national economy that the Plaintiff, considering his age, education, work experience, and residual functional capacity, can perform. Tr. at 12-17. Therefore, the ALJ concluded that the Plaintiff was not disabled within the meaning of the Social Security Act. Id. at 17-18. This Court finds that the ALJ's decision was supported by substantial evidence in the record.

Plaintiff's lower back and neck pain originally resulted from a work-related injury occurring on July 25, 1991. Id. 24-25, 290. Plaintiff's medical record begins with an x-ray of Plaintiff's lumbosacral spine on August 2, 1991 by Dr. Peter Mehnert, M.D.

which shows normal results.  Id. at 173.  Then, on August 2, 1991, Dr. James T. Haggerty conducted a CT scan of Plaintiff's lumbosacral spine.  Id. at 174.  The results indicated very slight disc bulging at L3-4, "considerable disc bulging centrally and increased prominence of the ligamentum flavum" at L4-5, and no evidence of abnormality at L5-S1.  Id.  Overall, Dr. Haggerty noted Plaintiff had "relative spinal stenosis at L3-4 secondary to slight disc protrusion and very prominent ligamentum flavum" as well as "disc bulging with borderline herniation at L5-S1."  Id.

Plaintiff filed a worker's compensation claim in connection with the work-related injury occurring on July 25, 1991 in which Plaintiff was found to have a "partial disability."  Id. at 31. The Plaintiff was examined by Dr. Fowler who diagnosed a partial disability and recommended further neurological examination.  Id. Dr. Fowler's exam revealed "level shoulders, hips, and gluteal folds with normal lordosis," but mild left paraspinal muscle spasms and straight leg raises were positive on the right.  Id. Dr. Fowler also noted good motion at the waist and a good heel to toe walk.  Id.

In addition, Dr. Andre R. Lefebvre conducted an independent examination of Plaintiff for his Worker's Compensation claim.  Id. at 282-87.  Dr. Lefebvre diagnosed "recurring right sided low back pain syndrome with transient radioculopathy, no myelopathy found," a "partial, mild to moderate" disability, and Plaintiff's employability was "light to medium capacity" with suggested "job

retraining at VESID." Id. at 286-87.  In his review of Plaintiff's medical records, Dr. Lefebvre noted that Dr. Pearle diagnosed Plaintiff with a "moderate temporary partial disability which limits lifting over 20 pounds" on August 27, 1993.  Id. at 283.

A third consultive physician diagnosed Plaintiff with a permanent partial disability in connection with his worker's compensation claim on May 4, 1994.  Id. at 289.

Plaintiff was incarcerated from 1996 to December 2000 under the supervision of the Georgia Department of Corrections.  Id. at 175-301.  During his first year of incarceration, Plaintiff complained of back pain.  Id. at 256, 263.  Despite his complaints, examining doctors found Plaintiff was able to perform his assigned work detail.  Id. at 269-270.  Additionally, an examining doctor found Plaintiff had a full range of motion, 5/5 motor strength, and could walk on heels and toes.  Id. at 191.

In 1997, Plaintiff visited the medical center on several occasions.  Id. at 233-36, 249-250, 257-58.  Specifically, Plaintiff alleged that he sprained his back on the basketball court on May 21, 1997.  Id. at 257.  After one visit, Plaintiff was removed from work assignment until his next medical appointment. Id. at 278.  On June 26, 1997, Plaintiff was diagnosed with spinal stenosis L3-4 and disc bulging L5-S1.  Id. at 250.  Plaintiff was given Motrin to relieve the pain and was not sent for further diagnostic testing or to the chronic illness clinic.  Id.

On July 1, 1998, Plaintiff was treated for turning his right ankle in basketball camp. Id. at 242.

On November 16, 1999, Plaintiff was examined for a Health/Activity profile. Id. at 188. The medical doctor rated Plaintiff's capability as "intermediate" work capacity, "intermediate" physical capability, and "strongest" upper extremity and lower extremity strength. Id. This doctor noted Plaintiff had been diagnosed with intervertebral disc disease and sciatic pain on the left side and that Plaintiff was "not impaired, normal." Id. On the same day, Plaintiff was restricted in his work detail to "no lifting over 20 pounds, no prolonged standing over 30 min., no bending or kneeling until May 16, 2000." Id. at 277. During an annual exam on November 24, 1999, Dr. Jacobs noted Plaintiff had an abnormal back and spine due to intervertebral disc disease and sciatic pain on the left side. Id. at 186.

In 2000, Plaintiff was treated on several occasions for back pain. Id. at 212, 217-221, 223. Plaintiff was instructed to continue exercises as previously ordered and to take ibuprofen to alleviate the pain. Id. Plaintiff denied any history of numbness, tingling, or loss of sensation due to his back pain. Id. at 221. During a follow-up back pain examination on January 20, 2000, the medical doctor noted that Plaintiff's condition was "good - no distress" and Plaintiff's lumbar spine had not changed since the evaluation on November 16, 1999. Id. at 223. The doctor again diagnosed intervertebral disc disease. Id.

On May 6, 2000, Plaintiff had full range of motion and no difficulty with straight leg raises despite complaints of "severe back pain." _Id._ at 212. Upon discharge from incarceration on December 12, 2000, Plaintiff had no history of a present illness, no current medications, and "no follow up care needed." _Id._ at 196.

On January 31, 2001, the New York Insurance Fund referred Plaintiff to Dr. Joseph N. Saba, M.D. in Riverdale, GA. _Id._ at 310. Plaintiff reported "history of chronic lumbar syndrome" since 1991 and having a "permanent partial disability." _Id._ During examination, Dr. Saba found "no definite atrophy," ability "to walk both on his tip toes and his heels," "sensory loss about the left L5/left S1 distribution to pin prick and light touch," and deep tendon reflexes are 2+ equal except for the left ankle jerk which is only a trace." _Id._ Dr. Saba diagnosed "disc herniation at the L5-S1 level with a left S1 radiculopathy" and a "history of possible spinal stenosis at the L3-4 level." _Id._

Plaintiff returned to Dr. Saba's office on February 21, 2001 complaining of severe pain which caused him to walk in an antalgic position. _Id._ at 311. Dr. Saba could not examine Plaintiffs range of motion and prescribed Oxycontin in response to Plaintiff's renewed request "to prescribe something stronger for his pain." _Id._

On April 26, 2001, Plaintiff attended a follow-up with Dr. Saba to review an electromyograph (EMG) which showed fibrillation on the left side with "positive waves at the lower left," the same muscles on the right side were normal, and the "anterior tibialis, gastronemius, and soleus were normal." Id. at 307. Dr. Saba also noted the Plaintiff's "H reflexes, surals, and peroneals were normal" and straight leg raises were normal, but that "the range of motion of the low back is reduced flexion 60 degrees." Id. Dr. Saba diagnosed chronic lumbar syndrome with "(a) significant setback by the patient's report; (b) history of possible spinal stenosis at L3-4; (c) disc bulge at the L4-5 level with the presence of a mild chronic non-compressive left L5 radiculopathy." Id. Lastly, Dr. Saba noted that Plaintiff "is using emotionally charged words to describe his pain, suffering and handicap. He states that his condition is getting worse and he would like a statement to that effect so that he can get Social Security. I gave him a statement saying that his symptoms are getting worse." Id. However, Dr. Saba's recommendations only included continuing Plaintiff's exercises and use of a TENS unit. Id.

Plaintiff had an MRI conducted on his lumbar spine on April 18, 2001 which revealed "degenerative discs at L3-4 and L4-5 with degenerative bulging, but no HNP." Id. at 312.

On May 21, 2001, Plaintiff returned to Dr. Saba's office complaining that "the only improvement he gets is on Oxycontin."

Id. at 306.  Upon examination, Dr. Saba again noted sensory loss about the left L5 to pin prick and light touch.  Id. Additionally, Dr. Saba noted that plaintiff's fundi is unremarkable, there is no atrophy, and no pathological reflexes. Id.  Dr. Saba noted that Plaintiff does not require surgery and referred Plaintiff to a pain clinic for chronic pain management. Id.

Plaintiff had a follow-up appointment with Dr. Saba on June 28, 2001 in which Plaintiff noted that he had been turned away from Social Security Disability.  Id. at 305.  Plaintiff received another prescription for Oxycontin after a long discussion about his condition with Dr. Saba.  Id.  Plaintiff stated he has moved and will be finding a new doctor closer to his new residence.  Id.

On October 3, 2001, Plaintiff returned to Dr. Saba's office "using emotionally charged words to describe his pain, suffering, and handicap."  Id. at 304.  Plaintiff requested Oxycontin, which Dr. Saba refused, and instead prescribed Ultram and Flexeril.  Id.

Plaintiff returned to Dr. Saba's office on January 3, 2006. Id. at 313.  Dr. Saba noted that Plaintiff had not visited the office in over 3 years.  Id.  Plaintiff again requested opiods, such as Oxycontin, which Dr. Saba refused.  Id.  During the exam, Dr. Saba noted Plaintiff walks in a stooped over position like "a frightened novice skier," no atrophy, no pathological reflexes, and no Babinski.  Id.  "Plaintiff's range of motion could not be examined because of the pain."  Id.  Dr. Saba further noted "[i]n

an abundance of caution, I am also taking the liberty of referring him [Plaintiff] to a neurosurgeon...for a second opinion." <u>Id.</u>

Plaintiff was examined and treated by Dr. Gregory Hopkins, M.D. on April 11, April 25, May 22, and August 17, 2006 for lower back pain that radiated down the left leg. <u>Id.</u> at 322-25. Plaintiff stated Oxycontin helped his pain, but that other pain medications slowly lost effect during his incarceration. <u>Id.</u> at 324. Dr. Hopkins diagnosed lumbroscral disc degeneration and sciatica and prescribed Vicodin and Soma 350mg for muscle spasms. <u>Id.</u> On August 17, 2006, Dr. Hopkins referred Plaintiff for pain management. <u>Id.</u> at 325.

On May 18, 2006, Plaintiff had an x-ray taken of his thoracic spine and his lumbar spine by Dr. Barry Smith, M.D. <u>Id.</u> at 315. The thoracic spine series showed "very mild degenerative disc disease with disc narrowing in mid-thoracic spine." <u>Id.</u> Further, the lumbar spine showed "degenerative disc disease with disc narrowing ... at L3-4, L4-5, and L5-S1." <u>Id.</u> This led Dr. Smith to diagnose mild degenerative disc disease for the thoracic spine, degenerative disc disease at L3-4, L4-5, and L5-S1, an "osteoarthritic change lumbosacral junction," mild scoliosis, and reduced lordosis. <u>Id.</u>

Dr. Bharat Gupta next treated Plaintiff on July 11, 2006 for back pain. <u>Id.</u> at 319-320. Dr. Gupta diagnosed "Bachache NOS[not otherwise specified]" and prescribed Vicodin. <u>Id.</u> at 320. Dr. Gupta observed tenderness upon palpation to the lumboscral

spine, but no kyphosis, scoliosis or paravertebral spasm. <u>Id.</u> On October 25, 2006, Plaintiff visited Dr. Gupta with substantially the same complaints and exams results. <u>Id.</u> 329-330. Dr. Gupta referred Plaintiff to a chiropractor and started Plaintiff on Vicodin. <u>Id.</u>

On November 5, 2007, Dr. Gupta completed a follow-up exam on plaintiff for back pain, which was "accident related." <u>Id.</u> at 331-32. Dr. Gupta noted that Plaintiff was in a motor vehicle accident. <u>Id.</u> at 331. The Plaintiff's complaints remained substantially the same. <u>Id.</u> at 332. Dr. Gupta noted no scoliosis and no kyphosis, but posterior tenderness along the spine and bilateral tenderness from L1 to S1. <u>Id.</u> Plaintiff was referred for physical therapy. <u>Id.</u>

Plaintiff participated in a consultative orthopedic exam on January 5, 2008 by George Alexis Sirotenko, D.O. <u>Id.</u> at 333-35. Plaintiff's complaints include back pain as well as "intermittent numbness in the lateral aspect of his left calf." <u>Id.</u> at 333. Plaintiff stated he had not been seen by a neurosurgeon, underwent physical therapy with improvement of symptoms, and has never been evaluated by a pain clinic. <u>Id.</u> Plaintiff did not appear to be in acute distress, had a normal gait, walked normally, could do a full squat, was able to rise from a chair without difficulty, and needed no help getting onto or off of the examination table. <u>Id.</u> at 334. Plaintiff reported that his daily activities include bathing and dressing himself, watching television, reading, listening to the

radio, and attending church.  Id.  During the examination, Dr. Sirotenko noted that the following limitations on the thoracic and lumbar spine: "lumbar spine flexion 40 degrees, extension 20 degrees, lateral rotation 20 degrees."  Id.  Also, Plaintiff has tenderness from L1 to L5.  Id.

As a result of this exam, Dr. Sirotenko diagnosed musculoskeletal ligamentous back pain with no features of extremity radioculopathy.  Id. at 335.  Dr. Sirotenko stated Plaintiff has a fair prognosis with "moderate limitations regarding repetitive lumbar spine forward flexion, extension or rotation," and Plaintiff should avoid "lifting objects over his head on a repetitive basis." Id.  Dr. Sirotenko also noted that based on his evaluation, Plaintiff does not require any assistive/supportive devices.  Id. Further, as a part of this examination, the Plaintiff had x-rays taken of his lumbosacral spine by Dr. Jitendra M. Sanghvi, M.D. Id. at 335-36.  The x-rays revealed moderate degenerative disc disease at L3-L4, slight narrowing of disc spaces at L4-L5 and L5-S1, and osteophytes in the lower lumbar spine.  Id. at 336.

Plaintiff continued to see Dr. Gupta throughout 2008 for neck and back pain.  Id. at 353, 357-372.  These examinations generally revealed posterior tenderness and bilateral tenderness from L5 to S1.  Id. at 353, 357, 364-65, 368, 370-71.  On January 24, 2008, Plaintiff asked Dr. Gupta to give him a letter stating "that he is totally and permanently disabled due to the aches and pains." Id. at 369.  On February 5, 2008, Dr. Gupta noted that Plaintiff was

not improving with physical therapy and instead referred Plaintiff to the pain clinic.  Id. at 368.

On March 3, 2008, Plaintiff was evaluated by Dr. Annie Philip at the Strong Memorial Hospital Pain Center.  Id. at 379-382. Plaintiff stated he experienced cervical whiplash as a result of a motor vehicle accident.  Id. at 379.  Since this accident, he has suffered from neck pain.  Id.  Plaintiff stated that the TENS unit and physical therapy only provided temporary relief.  Id. at 380. Dr. Phillip observed tenderness to palpation over L4-L5, no atrophy, 5/5 muscle strength in Plaintiff's upper and lower extremities, and a normal gait, posture and heel-to-toe walk.  Id. at 381.  Dr. Phillips concluded that Plaintiff's pain was mostly myofacial in origin and suggested the use an NSAID, such as Mobic to treat this pain.  Id. at 381.  Further, Dr. Phillips suggested discontinuing the Vicodin prescriptions because of Plaintiff's history of substance abuse as well as a urine toxicology screen to verify Plaintiff is taking medication correctly and is not currently using any recreational drugs.  Id.

Plaintiff had a follow-up visit at the pain clinic with Dr. Joel Kent on April 18, 2008.  Id. at 376-78.  Plaintiff reported that "his pain gets significantly better with the medication, heat therapy and a TENS unit."  Id. at 377.  During this visit, Plaintiff stated that he forgot to get his urine toxicology screen completed as instructed in his first visit.  Id.

Dr. Kent stated that this raised concern for inappropriate use of Plaintiff's Vicodin prescription.   Id.

An MRI of Plaintiff's cervical spine on March 31, 2008 showed spondylitic ridging at C3-4, C4-5, and C6-7.   Id. at 374.   There was no significant spinal stenosis present.   Id.

Plaintiff missed his scheduled follow-up appointment at the pain clinic on June 12, 2008.   Id. at 375.

Dr. Gupta treated Plaintiff for follow up appointments as well as chronic back pain complaints on May 21, 2008, July 2, 2008, August 1, 2008, October 23, 2008, December 1, 2008, December 22, 2008, and February 9, 2009.   Id. at 351, 353, 357, 359, 361, 363, and 413.   During the visit on February 9, 2009, Dr. Gupta noted that he will continue the pain medicines but noted that Plaintiff could work with restrictions.   Id. at 352.   Plaintiff "was very upset" and felt that Dr. Gupta "was not fair to him [Plaintiff]." Id.   Plaintiff "was not too happy" and argued that "he is totally disabled and cannot do any kind of job."   Id.   Finally, Plaintiff stated that "he want[ed] to switch to another doctor."   Id.

On March 20, 2009, Plaintiff visited Dr. Amanat M. Yosha, M.D. for chronic pain in his neck and lower back and requested "a letter for disability saying that he cannot work due to chronic back and neck pain."   Id. at 384-85.   Upon examination Dr. Yosha observed full range of motion of Plaintiff's back, a normal range of motion for Plaintiff's spine, and a normal gait.   Id. at 384.   Further, there was no swelling, deformity, or scoliosis, but decreased

cervical rotation.  Id.  Plaintiff requested Dr. Yosha prescribe Vicodin, but Dr. Yosha informed Plaintiff he does not prescribe Vicodin, and prescribed Flexeril and Ultram instead.  Dr. Yosha also referred Plaintiff to a physical therapist for his back and neck pain.  Id. at 385.

On May 5, 2009, Plaintiff was evaluated by physical therapist Scott Gogstetter.  Id. at 387.  On a follow-up on May 29, 2009, Plaintiff stated that "he feels looser and a little better since [his] initial eval[uation]."  Id. at 388.  Dr. Gogstetter noted no significant change to Plaintiff's range of motion and strength, and referred Plaintiff back to his practitioner.  Id.

Plaintiff returned to Dr. Gupta on April 15, 2009, July 1, 2009, August 3, 2009, and September 4, 2009.  Id. at 432, 434, 436, 438.  On the latest visit, Plaintiff noted that his pain was controlled with medicine at a level of "4/10."  Id. at 438.

A.   The ALJ properly determined that Plaintiff does not meet the criteria of Listing 1.04.

Plaintiff claims that the ALJ committed error in finding that Plaintiff's impairments do not meet the requirements of Listing 1.04.  Pl. Mem. of Law at 14.  Specifically, Plaintiff argues that he meets the requirements of Listing 1.04 which requires a disorder of the spine that results in the compromise of a nerve root or the spinal cord with evidence of nerve root compression.  Id.; 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). Plaintiff inaccurately cites the results of an MRI conducted on

April 18, 2001 in support of his claim.  Pl. Mem. of Law at 14.
The MRI Plaintiff refers to showed "disc bulging . . . *without
evidence of definite nerve root compression*."    Tr. at 312
(emphasis added).    Further, although this MRI showed "some
encroachment upon both L5 nerve roots," Dr. Hugo Falcon, Jr., M.D.
did not state that either nerve root or spinal cord compression was
present.  Id.  Without evidence of compression of the nerve root or
spinal cord, Plaintiff does not meet the requirements of Listing
1.04.   Thus, this Court finds that the ALJ correctly held that
Plaintiff does not meet step 3 of the analysis.

Additionally, although there are several instances in which
the Plaintiff has been diagnosed with spinal stenosis, none of
these instances indicate that "pseudoclaudication and inability to
perform fine and gross manipulation or ambulate effectively," which
would also cause Plaintiff to meet the requirements of Listing
1.04.  Id. at 12.  It is important to note that the diagnosis of
spinal stenosis was not consistent, as an MRI of Plaintiff's
cervical spine on March 31, 2008 showed no significant spinal
stenosis present.   Id. at 374.  Regardless, even if the Plaintiff
suffers from spinal stenosis, because the Plaintiff does not suffer
from pseudoclaudication and inability to perform fine and gross
manipulation or ambulate effectively, the Court finds that the ALJ
correctly held that Plaintiff does not meet the requirements under
Listing 1.04.

B.   The ALJ gave proper weight to Dr. Gupta's evaluation in the
     ALJ's Residual Functional Capacity Assessment.

Plaintiff claims that the ALJ did not give appropriate weight to the evaluations by Dr. Gupta in his Residual Functional Capacity Assessment (hereinafter RFC).  Pl. Mem. of Law at 17-21.  In the RFC, the ALJ found Plaintiff "has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull (including operation of hand and/or foot controls[]); and is precluded from overhead lifting." Tr. at 12.  Ultimately, Plaintiff argues that this variance from treating physician Dr. Gupta's recommendation, which stated that Plaintiff should not to lift more than 10 pounds and should not stand for more than 1 hour is erroneous. Pl. Mem. of Law at 17-21. The Court is not persuaded by this argument.

The treating physician's rule provides that "a treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder."  Schisler v. Heckler, 787 F.2d

76, 81 (2d Cir. 1986).  "Where the treating physician's opinion is not given controlling weight, the ALJ must determine how much weight to give the opinion by considering the following six factors: the length and frequency of the treating relationship; the nature and extent of the relationship; the amount of evidence the physician presents to support his or her opinion; the consistency of the opinion with the record; the physician's area of specialization; and any other factors the claimant brings to the ALJ."  Carlantone v. Astrue, 2009 WL 2043888 (S.D.N.Y. 2009).

The Court finds that Dr. Gupta is a treating physician. Dr. Gupta has examined Plaintiff on many occasions for complaints of neck and back pain as well as other ailments.  See generally Tr. at 319-320, 329-332, 351-372, 413, 432-439.  Plaintiff correctly argues that Dr. Gupta found that the Plaintiff is capable of working with restrictions such that Plaintiff should not to lift more than 10 pounds and should not stand for more than 1 hour at a time.  Id. at 352, 369.  However, despite the Plaintiff's claims to the contrary, this Court finds that the ALJ weighed this diagnosis heavily in forming his opinion that Plaintiff can perform light or sedentary work.  Id. at 12-16.  In addition to relying on the medical opinion of Dr. Gupta, the ALJ also considered the medical opinions of other acceptable medical sources in his determination of Plaintiff's Residual Functional Capacity.  Id. at 12-16, 277, 282-87, 333-35, 337-342.

During several of these visits with Dr. Gupta as well as visits to other acceptable medical sources, it is important to note Plaintiff repeatedly requested a letter stating that he is completely disabled for social security disability.  Id. at 307, 352, 369, 384-85.  Refusal to give Plaintiff this letter caused Plaintiff to use emotionally charged words to describe his condition as well as to make statements that Plaintiff would seek a new doctor for the purpose of receiving such a letter.  Id. at 369.

Further, Plaintiff incorrectly states that "there is no medical evidence contained in the record . . . [supporting this] RFC."  Pl. Mem. of Law at 19.  The ALJ's finding is supported by Dr. Gupta's diagnosis and recommendations.  Id. at 352, 369.  The ALJ's finding is also supported by the consultive examination of Plaintiff conducted by Dr. Andre R. Lefebvre for Plaintiff's Worker's Compensation Claim.  Tr. at 282-87.  It is further supported by the limitations put on the Plaintiff for work detail during his incarceration.  Id. at 277.  For example, on November 16, 2009, the doctor who evaluated Plaintiff at the Georgia Department of Corrections facility restricted Plaintiff in his work detail to "no lifting over 20 pounds, no prolonged standing over 30 min., no bending or kneeling" for a period of 6 months.  Id. Finally, the ALJ's decision regarding the Plaintiff's physical limitations is supported by the consultative examination by Dr. Sirotenko which was incorporated into the Physical Residual

Functional Capacity Assessment completed by disability examiner L. Patelunas. Id. at 337-342. The ALJ considered the opinions of these other acceptable medical sources in the light of the extensive records, opinions, and treatments by treating physician Dr. Gupta. Id. at 12-16. Thus, this Court finds that the ALJ gave appropriate weight to Dr. Gupta's opinion as the treating physician along with other acceptable medical sources.

C.  The ALJ gave proper weight to the testimony of Dr. Peter Mansey, a vocational expert.

The record contains supporting evaluations from several doctors, including treating physician Dr. Gupta, all of which suggest that the Plaintiff is at least limited to lifting no more than 20 pounds and should limit long periods of standing. Id. Under these limitations, the ALJ found that "there are jobs in significant numbers in the national economy that the claimant can perform," including light and sedentary work. Id. at 16. The testimony of Dr. Peter Mansey, a vocational expert, supports this finding.

In questioning a vocational expert, hypothetical questions must precisely and comprehensively set out every physical and mental impairment of the Plaintiff that the ALJ accepts as true and significant. Varley v. Sec'y of Health & Human Services, 820 F.2d 777, 779 (6th Cir. 1987). In the present case, Dr. Mansey's opinion was restricted to discussing a person experiencing the same conditions as the Plaintiff. Tr. at 37-38. Dr. Mansey testified

that considering the Plaintiff's limitations, Plaintiff could perform light work such as that of cashier or collator operator and sedentary work such as that of general assembler or addresser. Id. This Court finds that the ALJ correctly held that Plaintiff is capable of performing light work and sedentary work, specifically that of cashier, collator operator, general assembler, or addresser, and thus is not disabled under the Act.

D.   The ALJ properly developed the record.

In social security disability cases where the Plaintiff is proceeding *pro se*, the ALJ has a heightened duty to develop the record and "scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). Further, the ALJ must "make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability." Peed v. Sullivan, 778 F.Supp. 1241, 1246 (E.D.N.Y. 1991).

Here, the ALJ noted at the start of the hearing that he spoke with the Plaintiff and delayed the hearing by approximately six weeks in order to allow the Plaintiff the opportunity to retain an attorney. Tr. at 21. Plaintiff did not retain an attorney and instead Plaintiff stated that he was ready to proceed with the hearing *pro se* on September 22, 2009. Id.  The ALJ asked the

Plaintiff if he had any objection to the entering of his entire medical record into the record, and Plaintiff did not object.  Id. The record contains an abundance of documentation from Dr. Gupta, the Plaintiff's treating physician, as well as documentation from other acceptable medical sources including other physicians and consultative physicians.   In these reports and evaluation summaries, Plaintiff's treating physician, Dr. Gupta, clearly gave his medical opinion on numerous occasions that Plaintiff is capable of working with restrictions.  Id. at 352, 369.  Consultive examiner Dr. Sirotenko gave a similar opinion that Plaintiff can work with restrictions.  Id. at 333-35.  Lastly, Dr. Lefebvre stated Plaintiff's employability was "light to medium capacity" with suggested "job retraining at VESID."  Id. at 286-87. Ultimately, this Court finds that the ALJ met his duty to fully develop the record and correctly found that the Plaintiff is not disabled under the Act.

E.   The ALJ correctly evaluated the Plaintiff's credibility.

Once an ALJ has determined that an applicant suffers from a medically determinable impairment that could reasonably be expected to produce a claimant's pain and other symptoms, he is required to evaluate the intensity of these symptoms by the following factors: (i) daily activities; (ii) the location, duration, frequency, and intensity of your pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medications taken to alleviate this pain or these

symptoms; (v) other treatment used for relief of these symptoms; (vi) any other measures used to relieve the pain or symptoms; (vii) other factors regarding your restrictions or limitations due to pain or symptoms. 20 C.F.R. § 416.929(c)(3); SSR 96-7p. If the ALJ finds the Plaintiff's testimony not to be credible, than the ALJ must give a detailed explanation explaining the ALJ's reasoning behind his conclusion. See Marshall v. Heckler, 731 F.2d 555 (8th Cir. 1984).

In his decision, the ALJ discussed the Plaintiff's testimony regarding his living conditions, his daily activities, the Plaintiff's own description and testimony about his pain and symptoms, any and all measures used to relieve his pain including medications such as Oxycontin and Vicodin, use of a TENS unit, Plaintiff's general bodily positioning used to alleviate pain, and Plaintiff's participation in physical therapy. Tr. at 14-16. After considering these factors, the ALJ determined that Plaintiff's "statements are not credible to the extent that they are inconsistent with the . . . residual functional capacity assessment," which was based on the consultative examination by Dr. Sirotenko as well as the entire medical record provided by the Plaintiff. Id. at 12-16. The ALJ proceeded to give a detailed discussion of the Plaintiff's testimony in regards to these factors and further how the medical findings of Dr. Gupta and the other physicians related to and disagreed with many of the Plaintiff's claims. Id. Ultimately, this Court finds that the ALJ properly

considered the testimony of the Plaintiff in his finding that the Plaintiff is not disabled under the Act.

<u>**CONCLUSION**</u>

For the reasons set forth above, this Court finds that the Commissioner's decision to deny the Plaintiff benefits was supported by substantial evidence in the record. Therefore, I grant the Commissioner's motion for judgment on the pleadings. The Plaintiff's complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          May 3, 2011